UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:21-cv-587-MOC-DCK

| | | |
|---|---|---|
| **CEDRIC DEAN and CHARLENE HENDERSON EL,** | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | ORDER |
| **CITY OF CHARLOTTE,** | ) ) ) ) | |
| Defendant. | ) | |

**THIS MATTER** is before the Court on Defendant's Motion to Dismiss the Amended Complaint. (Doc. No. 24). Upon careful consideration of the arguments submitted by the parties, Defendant's Motion is **GRANTED** and this matter is **DISMISSED**. Defendant's initial Motion to Dismiss the Complaint, (Doc. No. 5), is accordingly hereby **DENIED** as moot.

I.   BACKGROUND

The City of Charlotte (the "City") recently redistricted the districts from which members of the Charlotte City Council are elected as a result of the 2020 federal decennial census. North Carolina law requires city councils to "evaluate the existing district boundaries to determine whether it would be lawful to hold the next election without revising districts to correct population imbalances" after each federal decennial census. See N.C. GEN. STAT. § 160A-21.1(a).[1] The census demonstrated significant shifts in population. See (Doc. No. 24-3). The shifts were so great that

---

[1] Under Session Law 2021-56, the City of Charlotte had until November 12, 2021 to "notify the appropriate county board or boards of elections…whether the municipality will be able to provide electoral districts revised in accordance with State and federal law on or before November 17, 2021."

1

they resulted in a variance in size of districts of greater than 10%, which the Supreme Court has held is presumed to violate the one-person-one-vote principle protected by the Equal Protection Clause of the Fourteenth Amendment. See Reynolds v. Sims, 377 U.S. 533, 568 (1964) (requiring "substantially equal" representation in state legislatures); Avery v. Midland Cnty., 390 U.S. 474, 485–86 (1968) (applying Reynolds to elections at the local level); Brown v. Thomson, 462 U.S. 835, 842–43 (1983) (establishing a presumption that population deviations of less than 10% are permissible and deviations of greater than 10% are impermissible for districts other than Congressional districts). As a result of these population shifts, the City enacted new electoral districts for members of the Charlotte City Council in 2021. That redistricting is the subject of this lawsuit.

Plaintiffs, proceeding pro se, initiated this lawsuit by filing a Complaint alleging racial gerrymandering on October 29, 2021, naming as Defendants the City of Charlotte and the "City of Charlotte Council," presumably referring to the Charlotte City Council. (Doc. No. 1). On November 12, 2021, the City moved to dismiss the lawsuit. (Doc. No. 12). The Court heard oral argument on February 3, 2022. The Court encouraged Plaintiffs to obtain legal representation and permitted Plaintiffs to orally move for leave to file an amended complaint. The Court orally granted such motion. Plaintiffs filed their amended complaint, pro se, on February 28, 2022. (Doc. No. 23). The amended complaint properly named the City of Charlotte as the Defendant and the Defendant "City of Charlotte Council" was then terminated. The City again moved to dismiss on March 14, 2022. (Doc. Nos. 24, 25).

In the amended complaint, Plaintiffs argue that Charlotte City Council Districts 1 and 4 are unconstitutional racial gerrymanders. (Doc. No. 23 at 2).[2] More specifically, Plaintiffs challenge

---

[2] Defendants do not provide page numbers and use paragraphs which are not accurately

2

the removal of precincts 42 and 82 from District 4 and their placement in District 1. These precincts are part of the Hidden Valley neighborhood of Charlotte. Plaintiffs therefore ask the Court "to require that new city districts be drawn forthwith to remedy the unconstitutional districts." (Id.). Plaintiffs appear to challenge the redistricting as a racial gerrymander under both the Voting Rights Act and the Equal Protection Clause. Plaintiffs take particular issue with a statement by former City Attorney Mac McCarley that "people of color were the predominate [sic] voters redistricted," which they characterize as "clear evidence that race was the predominant factor." (Id. at 12; Doc. No. 27 at 2).

The City moved to dismiss under Rule 12(b)(6). (Doc. Nos. 24, 25). The City contends that its redistricting was legally necessary to respond to population shifts. (Doc. No. 25 at 5–8). The City notes that the redistricting did not significantly change the racial impact of Districts 1 and 4: District 4 had a 43.9% black population before the redistricting and a 43.0% black population after; for District 1 the figures are 26.3% before and 33.6% after. (Id. at 8; see Doc. No. 24-3). The City argues that Plaintiffs fail to state an Equal Protection Clause claim for racial gerrymandering because racial considerations did not predominate in redistricting and traditional race-neutral criteria were not subordinated to racial consideration, (Id. at 9–12), and argues that their Voting Rights Act claim fails because Plaintiffs fail to satisfy the Gingles factors and focused on precincts rather than districts as Gingles requires.

II.     **STANDARD OF REVIEW**

In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all of the factual allegations in the Complaint and draw

---

numbered—the paragraphs are numbered inconsistently and the numbering changes occasionally throughout. The Court will refer to Defendant's complaint using page numbers starting with 1 for the cover sheet, 2 for the page with the "**Introduction**" heading, and so forth.

3

all reasonable inferences in the light most favorable to the plaintiff. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56 (2007). However, to survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level," with the complaint having "enough facts to state a claim to relief that is plausible on its face." Id. at 570. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 555). A complaint may survive a motion to dismiss only if it "states a plausible claim for relief" that "permit[s] the court to infer more than the mere possibility of misconduct" based upon "its judicial experience and common sense." Id. at 679 (citations omitted).

Where plaintiffs are proceeding pro se, as here, the court must construe the complaint liberally. Brown v. Charlotte Rentals LLC, No. 3:15-cv-0043-FDW-DCK, 2015 WL 4557368, at *2 (W.D.N.C. July 28, 2015) (citing Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978)). At the same time, however, the Court should not "assume the role of advocate for the pro se plaintiff." Gordon, 574 F.2d at 1151 (quotation omitted). While the Court may construe Plaintiffs' complaint liberally, the complaint must still allege "'facts sufficient to state all the elements of [their] claim'" to survive a motion to dismiss. Williams v. Wal-Mart Stores East, L.P., No. 5:18-CV-33-BO, 2018 WL 3341181, at *2 (E.D.N.C. July 6, 2018) (quoting Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 765 (4th Cir. 2003)).

### III. DISCUSSION

The Equal Protection Clause of the Fourteenth Amendment and the Voting Rights Act both guarantee to every voter that electoral districts will not be drawn predominately on the basis of race for the purpose of excluding minority groups from political representation. But neither

4

guarantees to any voter the electoral district of his or her choosing. In this case, Plaintiffs allege racial gerrymandering. But, for the following reasons, their claims fail as a matter of a law.

> *a. Plaintiffs Fail to State a Claim of Racial Gerrymandering Under the Voting Rights Act Because they do not Satisfy the <u>Gingles</u> Factors*

Plaintiffs purport to bring a claim for relief under Section 2 of the Voting Rights Act. (Doc. No. 23 at 6). Section 2 prohibits "the denial or abridgement of the right… to vote on account of race or color." 52 U.S.C. § 10301(a). Claims under Section 2 are governed by a three-factor test created by the Supreme Court in <u>Thornburg v. Gingles</u>, 478 U.S. 30, 50–51 (1986). The factors are known as the <u>Gingles</u> factors, and Plaintiffs must satisfy each factor in order to state a racial gerrymandering claim under the Voting Rights Act. Only when plaintiffs can satisfy the <u>Gingles</u> factors do courts turn to an analysis involving the "totality of the circumstances" to discern whether racial gerrymandering has occurred. The three <u>Gingles</u> factors are that:

1. the racial group is sufficiently large and geographically compact to constitute a majority in a single-member district;
2. the racial group is politically cohesive; and
3. the majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate.

<u>See</u> <u>League of United Latin Am. Citizens v. Perry</u>, 548 U.S. 399, 425 (2006).

To the extent Plaintiffs bring this action on behalf of two precincts in the Hidden Valley Community (as they appear to do), their Voting Rights Act claim fails as a matter of law because they cannot satisfy factor #1. As discussed at oral argument, the two precincts in question in this litigation represent about 5,000 voters. But districts for the Charlotte City Council generally number around 125,000. (<u>See</u> Doc. No. 24-3). A majority of such a district would be approximately 63,000. Therefore, even if every single voter in the two precincts was a member of the same "racial

5

Case 3:21-cv-00587-MOC-DCK   Document 29   Filed 05/26/22   Page 5 of 13

group," the group would still not be "sufficiently large … to constitute a majority in a single-member district" under Gingles. Gingles guards against cases where a racial group that is entitled to representation is denied such representation by being "cracked" into multiple districts, thereby diluting the group's vote and denying them a representative. But in this case, the voters of Hidden Valley are not entitled to their own representative because there are simply not enough of them. Therefore, their claim under the Voting Rights Act fails as a matter of law.

If, on the other hand, Plaintiffs seek to bring this action on behalf of black voters in Charlotte, the action fails as a matter of law because they cannot satisfy factor #3. There is no evidence that white voters vote as a bloc to deny black voters their preferred candidates. Indeed, the Charlotte City Council appears to reflect the vibrant diversity of the City itself. Gingles sought to prevent the majority from denying representation to minority groups by voting as a bloc. (striking down districts that "discriminated against blacks by diluting the power of their collective vote"). But there is no evidence that this is occurring in Charlotte. Absent clear evidence that a majority bloc is denying minority voters representation citywide, the Court cannot contemplate the extraordinary remedy of judicially mandated redistricting under the Voting Rights Act.

In addition, Section 2(b) of the Voting Rights Act provides that "[t]he extent to which members of a protected class have been elected to office . . . is one circumstance which may be considered" in determining whether racial gerrymandering is occurring. 52 U.S.C. § 10301(b). As the City notes and as Plaintiffs concede, District 4 has consistently elected minority-preferred candidates and is likely to continue to do so. (Doc. No. 28 at 2; see also Doc. No. 23 at 4, 15). Therefore, this factor further militates against any suggestion that racial gerrymandering is occurring. Plaintiffs may wish to be located within District 4, but the Voting Rights Act does not

6

Case 3:21-cv-00587-MOC-DCK   Document 29   Filed 05/26/22   Page 6 of 13

allow voters to choose their electoral districts. Rather, the Voting Rights Act prohibits racial gerrymandering and other discriminatory voting practices.

Plaintiffs also repeatedly propound the argument that:

> [I]n creating new districts, the city was obligated to follow the decisions by the North Carolina Supreme Court and the United States Supreme Court in <u>Strickland v. Bartlett</u>, 361 N.C. 491 (2007), affirmed, <u>Bartlett v. Strickland</u>, 129 S. Ct. 1231 (2009). Under the <u>Strickland</u> decisions, districts created to comply with section 2 of the Voting Rights Act, must be created with a "Black Voting Age Population" ("BVAP"), as reported by the Census, at the level of at least 50% plus one. Thus, in construing VRA majority black districts, the Chair failed to instruct that, where possible, District 1 and 4 be drawn at a level equal to at least 50% plus on "BVAP."

(Doc. No. 23 at 5–6; <u>see also</u> Doc. No. 27 at 3–4).[3] This argument is mistaken because Districts 1 and 4 are <u>not</u> districts "created <u>pursuant to</u> Section 2" of the Voting Rights Act. <u>Pender Cnty. v. Bartlett</u>, 649 S.E.2d 364, 372 (N.C. 2007) (emphasis added). While <u>all</u> districts must comply with Section 2, the <u>Pender County</u> court was referring to the special case of majority-minority districts created to remedy or prevent Section 2 violations by ensuring that a minority group is empowered to elect its preferred candidate. <u>Id.</u> This requirement only applies in circumstances where the <u>Gingles</u> factors are satisfied and where the "totality of the circumstances" indicates that the minority group's vote is at risk of unlawful suppression, necessitating a majority-minority district to cure such suppression.

Because Districts 1 and 4 were not created to remedy Section 2 violations, the requirement that they be majority-minority districts does not apply. Furthermore, the current black population of District 1 is 33.6% and the current black population of District 4 is 43.0%. Therefore, it is unclear how Plaintiffs' alleged requirement that both districts be majority black could be satisfied mathematically, let alone required legally. (Doc. No. 24-3).

---

[3] The Court will refer to the N.C. Supreme Court case as <u>Pender Cnty.</u> to avoid conflating it with the similarly named Supreme Court case. <u>Pender Cnty. v. Bartlett</u>, 361 N.C. 491, 649 S.E.2d 364 (N.C. 2007).

7

If anything, the Bartlett decision specifically undermines Plaintiffs' claim because the Bartlett court held that there was no requirement to create majority black districts in geographic areas where black voters did not constitute a numerical majority, as is the case in District 1 and District 4. Bartlett v. Strickland, 556 U.S. 1, 15 (2009) (denying Section 2 claim "because [petitioners] form only 39 percent of the voting-age population in District 18"). The 39% figure from Bartlett is not far from the 43.0% figure in District 4, and exceeds the 33.6% figure for District 1. The Bartlett Court held that, where there is not clear evidence that a potential majority of minority voters is being suppressed by racial gerrymandering, minority voters must resort to the political process rather than the courts to achieve political power. As the Bartlett Court explained, "[n]othing in § 2 grants special protection to a minority group's right to form political coalitions. '[M]inority voters are not immune from the obligation to pull, haul, and trade to find common political ground.'" Id. (citing Johnson v. De Grandy, 512 U.S. 997, 1020 (1994)). That reasoning appears to apply in this case as well.

> b. *Plaintiffs Fail to State a Claim of Racial Gerrymandering Under the Equal Protection Clause*

To establish a claim of racial gerrymandering under the Equal Protection Clause, a plaintiff must prove that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district," which requires showing that the legislature "subordinated" traditional redistricting factors to race in drawing district lines. Cooper v. Harris, 137 S. Ct. 1455, 1463–64 (2017). The Court finds that Plaintiffs fail to state such a claim.

First, as the City notes in its memorandum, the City was constitutionally required to redraw the districts in response to population shifts. (Doc. No. 25 at 10). As discussed above, under the Equal Protection Clause a population deviation of greater than 10% between districts is presumed

8

Case 3:21-cv-00587-MOC-DCK   Document 29   Filed 05/26/22   Page 8 of 13

to be unconstitutional, in violation of the one-person-one-vote principle protected by the Equal Protection Clause. Census data revealed that there was a deviation of 21.8% between existing Charlotte City Council districts, necessitating redistricting to cure the constitutional violation. (Doc. No. 25 at 10). While complying with the one-person-one-vote principle is a background rule rather than a traditional districting criterion, see Alabama Legislative Black Caucus v. Alabama, 575 U.S. 254, 273 (2015), it was the city's clear motivation for initiating this redistricting. As the City argues, it was the three districts with the highest black population that also experienced the most significant growth and, therefore, from which voters needed to be moved in order to restore districts of equal size. (Doc. No. 25 at 5–11). Therefore, taking as true Plaintiffs' claim that black voters were more likely to be moved than other voters in the recent redistricting, this appears to have been caused by demographic factors and so this fact alone is not evidence that race impermissibly predominated over other factors in the redistricting. It is the composition of the resulting districts, not who was moved, which the Court must consider in evaluating a claim of racial gerrymandering.

Second, Plaintiffs fail to plausibly allege that race impermissibly predominated over traditional redistricting factors in drawing Districts 1 and 4 because the redistricting appears to have resulted in more, not less, minority voter influence. As the City points out, the redistricts resulted in a negligible decline of the black population in District 4, from 43.9% to 43.0%. In District 1, the black population increased from 26.3% to 33.6% and the white population declined from 50.7% to 41.8%. (Id. at 8; see Doc. No. 24-3). These facts are simply inconsistent with a "predominant motive" of racial gerrymandering. In addition, as the City points out and as Plaintiffs admit, District 4 has and will continue to elect minority-preferred candidates. (Doc. No. 28 at 2; see also Doc. No. 23 at 4, 15). In other words, it is highly probable that the two districts in question

will continue to return at least one minority-preferred candidate. As the City argues, that is entirely inconsistent with a scheme to reduce minority representation.

Third, while Plaintiffs claim that race was the predominant factor, they fail to plead facts actually tending to establish this principle. Moreover, Plaintiffs do not discuss any traditional districting criteria such as compactness, contiguity, and respect for political subdivisions, let alone attempt an argument that any of these were improperly subordinated to race. (Doc. No. 25 at 11, citing Miller v. Johnson, 515 U.S. 900, 916 (1995)). As the City points out, "[d]espite the significant task at-hand of reducing a 21.8% deviation to a 5.3% deviation, all redistricted precincts already shared a border" with their new districts. (Id.). Because only "border" precincts were shifted in the redistricting, the resulting new districts are largely similar to the old districts from the perspective of compactness and contiguity. Therefore, the City appears to be correct in arguing that "Plaintiffs do not allege that the previous districts lacked compactness or contiguity before the redistricting and, thus, it must follow that they contend they do not now." (Id.). Plaintiffs do not address the question of political subdivisions, another traditional redistricting factor. But, to the extent the Hidden Valley community constitutes a political subdivision, the new plan appears to pass muster in this respect as well because it keeps the Hidden Valley community together in the same district. (Id. at 11–12).[4] The Court is not aware of any fact tending to show that race predominated in the drawing of the new districts, nor do Plaintiffs point to a single traditional redistricting factor which was unconstitutionally subordinated to race.

---

[4] The City is correct that the Constitution does not require that Hidden Valley be kept together, but it is also true the keeping communities together is a legitimate factor to consider in redistricting. To be clear, however, it is keeping political subdivisions, like counties and cities, together that courts have traditionally recognized as a traditional districting factor, rather than the less-readily-defined concept of communities. However, keeping communities together is certainly a valid factor to be considered in redistricting and, as the City argues, the recent redistricting appears to keep the Hidden Valley community together.

Fourth, while there is no evidence that the City engaged in racial gerrymandering, the City persuasively argues that Plaintiffs are asking this Court to engage in racial gerrymandering on their behalf. (Doc. No. 25 at 11–12). Specifically, they argue that "the U.S. Constitution guarantees every Precinct 42 and 82 member the power to elect their preferred candidate of color." (Doc. No. 23 at 15). This is not so. The Constitution does not guarantee to every voter a representative of her same racial group, nor does it guarantee to every community a representative of the same racial group as that community. Indeed, this result could not be achieved without sorting all voters into racially homogenous blocs—an outcome the Equal Protection Clause generally seeks to avoid, as Plaintiffs themselves point out in their pleadings. Miller, 515 U.S. at 911 ("a State may not, absent extraordinary justification, … separate its citizens into different voting districts on the basis of race"); (see Doc. No. 23 at 6; Doc. No. 27 at 3). However, the Constitution does guarantee to every voter an absence of race predominating in the drawing of electoral districts.

Plaintiffs argue that their interest in being represented by a "preferred candidate[] of color," which they erroneously claims is protected by the Constitution and the Voting Rights Act, is "more important than numbers related to the demographical increases in District 4." (Doc. No. 23 at 15). Plaintiffs appear to be arguing that their racial preference of candidate should predominate over the traditional, constitutionally-mandated factor of complying with the one-person-one-vote principle. Plaintiffs ask this Court to order redistricting accordingly. The Court declines to do so, not only because Plaintiffs' claims fail as a matter of law, but also because doing so could itself amount to a form of racial gerrymandering to the extent that Plaintiffs ask the Court to subordinate the one-person-one-vote principle to their racial preference in candidate.

In addition, moving precincts 42 and 82 from District 1 to District 4, without moving other precincts to cure the resulting shift in numbers, would have the effect of packing minority voters

11

into District 4. This would have the effect of diluting the strength of votes in District 4 and increasing the power of votes in District 1. Because District 4 regularly elects minority-preferred candidates and District 1 is less diverse than District 4, this could arguably reduce minority voting power in the City. Therefore, Plaintiffs' request could be characterized as potential racial gerrymandering in this respect as well, as the City persuasively argues. (Doc. No. 25 at 11–12)

## IV. CONCLUSION

Plaintiffs may desire to have been placed in a different electoral district, but unless they can establish a legal claim of racial gerrymandering, their remedy is through the political process, not the legal system. Districting decisions are inherently political and, as such, are generally committed to the political branches of government. Courts only take the extraordinary step of intruding on this political process when there is clear evidence that constitutional rights are being violated.

There is no such evidence here. There is simply no evidence that the City marginalized voters of color in the most recent redistricting, and there is ample evidence that the City undertook to cure the constitutional defect caused by districts that were not "substantially equal" in size as a result of population shifts. Plaintiffs cannot plausibly allege that they are victims of racial gerrymandering as that is understood by courts. In addition, Plaintiffs' apparent motivation in bringing this suit appears to subordinate the constitutionally-mandated requirement of complying with the one-person-one-vote principle to Plaintiffs' racial preference in candidate, and thus is itself constitutionally problematic. This Court finds that Plaintiffs' claims under the Voting Rights Act and under the Equal Protection Clause both fail as a matter of law.

**ORDER**

**IT IS, THEREFORE, ORDERED** that Defendant's Motion to Dismiss the Amended Complaint, (Doc. No. 24), is **GRANTED**.

Defendant's initial Motion to Dismiss the Complaint, (Doc. No. 5), is accordingly hereby **DENIED** as moot.

Signed: May 26, 2022

Max O. Cogburn Jr.
United States District Judge